**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | No. 22-cr-150 (JEB) |
| | : | |
| RAMANAN PATHMANATHAN | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

Mr. Ramanan Pathmanathan comes before the Court for sentencing after entering a guilty plea, fully admitting his conduct, and accepting full responsibility. Mr. Pathmanathan also previously entered a guilty plea and accepted responsibility for this course of conduct in Canada and was sentenced to a 12-year term of incarceration. Mr. Pathmanathan acknowledges without reservation the seriousness of his conduct and has now accepted complete responsibility in two courts. He understands and accepts that he will serve a significant sentence of incarceration. Mr. Pathmanathan is committed to continuing to do everything he can while incarcerated to seek treatment, continue his education, and take classes or gain experience that will provide him with skills that he can use upon his release.

Given the sentence Mr. Pathmanathan received and is serving in Canada, Mr. Pathmanathan respectfully submits that a sentence of 15 years is sufficient, but not greater than necessary, to satisfy the purposes of punishment and account for the factors in 18 U.S.C. § 3553(a).

## I. LEGAL STANDARD

When imposing a sentence, the Court must consider several factors, including (1) the United States Sentencing Guidelines; (2) the nature and circumstances of the offense; (3) the history and characteristics of the defendant; (4) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford

adequate deterrence to criminal conduct, along with the kinds of sentences available; and (5) the need to avoid unwarranted disparities.  *See* 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005).

> Congress has further provided that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.*

18 U.S.C. § 3582 (emphasis added).  With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]."  18 U.S.C. § 3553(a) (emphasis added).

When sentencing a defendant, the Court "may not presume that the Guidelines range is reasonable."  *Gall v. United States*, 552 U.S. 38, 50 (2007).  Rather, the Court must treat the Guidelines "as one factor among several" that § 3553(a) requires the Court to consider.  *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).  Once the Court correctly calculates the sentence that the Guidelines recommend, the Court must then "make an individualized assessment," considering the remaining factors set forth in § 3553(a).  *Gall*, 552 U.S. at 50.  Because the Guidelines merely reflect a "wholesale" view "rough[ly] approximat[ing] . . . sentences that might achieve § 3553(a)'s objectives," *Booker* and § 3553(a) require the Court to tailor an individualized sentence that actually does achieve § 3553(a)'s objectives in the case before it.  *Rita v. United States*, 551 U.S. 338, 348, 350 (2007).  Consequently, this Court must "filter the Guidelines' general advice through § 3553(a)'s list of factors."  *Id.* at 358; *see also Gall*, 552 U.S. at 52 ("'It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique

study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996))).

## II.  ARGUMENT

In reviewing all the applicable factors set forth in § 3553(a), Mr. Pathmanathan submits that 15 years imprisonment is the appropriate sentence in this case; and, considering that sentence in conjunction with the Canadian sentence, a higher sentence would be greater than necessary to meet the sentencing purposes set forth in § 3553(a)(2).[1]

Mr. Pathmanathan fully accepts responsibility for the conduct in this case.  As Bryan Stevenson put it, "Each of us is more than the worst thing we've ever done."  Bryan Stevenson, *Just Mercy: A Story of Justice and Redemption* (2014) at 17-18.

### A.  History and Characteristics of Mr. Pathmanathan.

#### 1.  *Early Childhood: War and Instability*

Mr. Pathmanathan was born in a village in Sri Lanka.  He lived with his parents, two older brothers, and younger sister.  At the time Mr. Pathmanathan was born, the Sri Lankan civil war had already started.  As a child, Mr. Pathmanathan remembers having to retreat to a bunker to hide from the fighting and attacks.  The war also caused his father to move to Canada for work, leaving Mr. Pathmanathan and his siblings with their mother in Sri Lanka.  When the war became too much for his family to manage, they decided to move from Sri Landa to India, but that journey was itself a challenge.  They had to walk from their home to another village near the

---

[1] U.S.S.G. § 5G1.3(b) states that a Court should adjust a term of incarceration for any term of incarceration served on relevant conduct in another jurisdiction that will not be credited by the Bureau of Prisons and run a sentence concurrent to any undischarged term of imprisonment.  The conduct in Canada and the conduct here are all part of the same course of conduct, therefore, the Canadian case is relevant conduct for this case and the Court should adjust the term of incarceration accordingly to account for the 12-year sentence in Canada.

ocean, where they boarded a boat to take them somewhere else where they could fly the rest of the way to India.  Mr. Pathmanathan remembers bombs and explosions as a child and the fear of growing up in a war zone.

The family then spent four years in India—most of Mr. Pathmanathan's elementary school years—before having to return to Sri Lanka for a year to finalize the process to immigrate to Canada and join his father.  Mr. Pathmanathan's childhood was spent either in a war zone or in an unfamiliar country, with the expectation that neither location would be permanent.  The lack of stability, absence of his father, and exposure to the dangers of the Sri Lankan civil war shaped Mr. Pathmanathan's childhood and early development.

After immigrating to Canada, Mr. Pathmanathan faced the culture shock of starting middle school in a completely new country.  But Mr. Pathmanathan eventually adjusted to life in Canada.  As a student in middle and high school, Mr. Pathmanathan played baseball and focused on his academics.  He developed strong friendships, which even continued into college.



Mr. Pathmanathan and his family are extremely close, and he appreciates all that his parents went through and sacrificed to bring him and his siblings to Canada to live in a more

stable and safe environment. ███████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████

### 2. *Online Gambling and His Withdrawal from Family and Friends*

Mr. Pathmanathan enrolled in college at Brock University. When Mr. Pathmanathan was in college, he and his friends would go to the casino relatively frequently and, eventually, got involved in online poker. Mr. Pathmanathan enjoyed playing poker and received some coaching to improve his skills. After he began winning more consistently, he decided that he did not want to finish college and that he could make a living playing poker. In his third year, Mr. Pathmanathan dropped out to play poker full-time. Although his family questioned his decision to drop out, his initial financial successes seemed to validate his decision to pursue poker full time. *See* Ex. A at 1, Letters in Support ("He gradually lost interest in his studies and ultimately discontinued his education. When questioned, he did not provide clear explanations for his decision. When encouraged to seek employment, he stated that he intended to earn money through playing poker."). In his early and mid-20s, Mr. Pathmanathan was making more than enough money to live playing poker. He and his brother were even able to jointly purchase a home for their parents, partially with his winnings. *See id*. at 4 ("[H]e contributed significantly providing $40,000 toward the down payment and consistently contributing $400 per month toward the mortgage."). Mr. Pathmanathan felt proud to provide for his parents and he felt successful compared to his friends who were finishing college and starting out in entry-level jobs.

That success was short lived. When Mr. Pathmanathan started losing more and more, he became more and more reckless with his gambling. He stopped seeing friends as often, stayed at

home, and gambled well into the night and early mornings. While he was losing, he also saw his friends start to gain success in their fields and he began to doubt his choices. As if to prove to himself that he made the right decision to drop out of college, he hid the truth from his friends, spent more time alone, and doubled down on his gambling.

By the time he was 30 years old, Mr. Pathmanathan was living his life almost entirely online. *See id.* at 1 ("Around the age of 30 we began to notice a gradual but concerning change in him. He withdrew from his social life, stopped visiting friends and relatives, and became increasingly isolated. He spent most of his time alone."); *id.* at 6 ("He became increasingly isolated, withdrew from social and family life, and spent most of his time alone and absorbed in an online world."). He gambled, looked at pornography, played other online games, and just spent all his time isolated and alone. He lost over $100,000 and spent over $20,000 on other addictive online games. He describes a day in his life as: "I would wake up, have breakfast, go online to game, play poker, look at porn." He was not spending time with friends or family because he did not want them to know about his losses.

He knew his isolation and online life was not healthy and he understood that it was likely a symptom of depression and possibly addiction, but he was not ready to admit it to himself and he was afraid to ask for help. ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

### 3. Acceptance of Responsibility and Initial Steps Toward Rehabilitation

Mr. Pathmanathan's online conduct eventually led him to riskier and riskier behavior and to more and more inappropriate places online. The conduct in this case grew out of his obsessive online engagement and involvement in darker areas of the internet. Mr. Pathmanathan is

extremely ashamed of the choices he made, the actions he took, and the harm he caused all of the victims and their families. *See id.* at 2 ("During every visit he has expressed deep remorse for the harm he caused. He has not made excuses. He has acknowledged what he did and shown consistent regret for it."); *id.* at 5 ("[H]e repeatedly expressed sincere remorse. He has apologized not only for the impact on our family but, more importantly, for the harm caused to the victims. He has spoken about how he now understands the gravity of his actions and has expressed deep regret, stating that he wishes he could go back and make different choices."). There is no excuse for his actions, and he does not seek to justify or diminish the seriousness of his actions in any way.

Mr. Pathmanathan was originally arrested and charged in Canada. Prior to his guilty plea in Canada, Mr. Pathmanathan was released pretrial on stringent conditions. During that time, he reconnected with his family, as he was forced out of his online world and into the real world. *See id.* at 2 ("During the period he was released on bail we observed a significant change in him. He was visibly remorseful and carried the weight of what he had done in a way that was clear to us without anything needing to be said."). Mr. Pathmanathan is grateful for that opportunity to spend time with his family and recognize the dark place he allowed himself to go and the work that he needs to put in in the future to rebuild his life. *See id.* at 7 ("I do not believe he is someone without conscience or without the capacity to change. I believe he went through an extremely dark period, one that led to real harm, and that he is not the same person who was in that darkness. The changes I have described are not small or superficial. They reflect someone who has genuinely confronted what he did and is working hard to be something better.").

Mr. Pathmanathan accepted responsibility for his actions in Canada and was sentenced to 12 years incarceration. He was serving his sentence in that case when he was extradited to the

United States to face prosecution here.  He fully accepts responsibility for his actions in this case as well and entered a guilty plea in January 2026.

While he was incarcerated in Canada, Mr. Pathmanathan enrolled in every course he could, completing numerous life skills and bible study classes.  *See* Ex. B, Canadian Certificates. Since he has been at the D.C. Jail, Mr. Pathmanathan has continued to take any classes available, completing dozens of courses available on the tablet.  *See* Ex. C, D.C. Jail Certificates.  Mr. Pathmanathan understands and accepts that he will spend a significant amount of time incarcerated, but he is committed to using his time productively and doing everything he can to get the help he needs and position himself to be a positive member of society upon his release.

For all the reasons described above, Mr. Pathmanathan's history and characteristics support a sentence of 15 years' incarceration.

## B.  The Nature and Circumstances of the Offense.

There is no question that the nature and circumstances of the offense here are extremely serious.  Mr. Pathmanathan recognizes the gravity of his conduct and that he faces a significant period of incarceration.  He accepted full responsibility for his conduct in Canada and accepts full responsibility for his conduct here.

## C.  The Need to Provide Adequate Deterrence to Criminal Conduct, Protect the Public from Further Crimes of the Defendant, Promote Respect for the Law, and Provide Just Punishment.

The "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper*, 562 U.S. at 493 (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing:  just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2).  Pursuant to 18 U.S.C. § 3553(a)(1)(2)(A), Mr. Pathmanathan's sentence must

8

9

reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

A 15-year sentence will protect the public, deter, and promote respect for the law.





"[T]he research consistently demonstrates that recidivism rates for people who have been convicted of a sex offense are substantially lower than most people believe, and in fact, are among the lowest of all people convicted of a crime."  Mary Helen McNeal & Patricia Warth, *Barred Forever: Seniors, Housing and Sex Offense Registration*, 22 Kan. J.L. & Pub. Pol (Spring 2013), at 344-45.  The Bureau of Justice Statistics reports that "compared to non-sex offenders released from State prison, sex offenders had a lower overall rearrest rate."  *Id*. at 345, citing U.S Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, *Recidivism of Sex Offenders Released from Prison in 1994*, (2003), available at http://bjs.ojp.usdoj.gov/ content/pub/pdf/rsorp94.pdf.  "Researchers conclude that long-term recidivism rates are lower for sex offenders than for the general criminal population.  Researchers also have argued that

---

[2] *See also* Anja Schulz et al., *Social Anxiety and Loneliness in Adults Who Solicit Minors Online*, 29 J. of Sexual Abuse 519 (2017).

[3] Given the fact that Mr. Pathmanathan is currently serving a 12-year sentence in Canada, will be returned to Canada to finish that sentence immediately after the sentencing hearing in this case, and then will be sent to the Bureau of Prisons to serve his U.S. sentence, even if the Court sentences Mr. Pathmanathan to 15 years of incarceration, the total additional time served after sentencing (in both countries) will likely be closer to 20 years or more.

offenders who receive specialized and intensive sex offender treatment have a significantly lower rearrest rate than offenders who did not participate in treatment." CSOM, Office of Justice, Department of Justice, *An Overview of Sex Offender Management*, July 2002, available at http://www/csom.org/pubs/csom_bro.pdf at p. 4. "Research demonstrates that observed recidivism rates for sexual, violent, and non-violent crimes are lower when sex offenders receive appropriate interventions, such as proper supervision and treatment." Department of Justice Publication, *The Comprehensive Approach to Sex Offender Management* (Nov. 2008), pp 1-2, available at http://www.csom.org/pubs/Comp_Approach_Brief.pdf. "Treatment is an essential component of a comprehensive sex offender management system. The primary goal of sex offender treatment is to assist individuals to develop the necessary skills and techniques that will prevent them from engaging in sexually abusive and other harmful behaviors in the future, and lead productive and prosocial lives." *Id*. at 5.

Additionally, a sentence of 15 years would result in Mr. Pathmanathan's release in his late fifties at the earliest, but, given the Canadian sentence, it is more likely he would be released when he is in his 60s. "For years, research has consistently confirmed one fact: recidivism rates decline with age." *Barred Forever*, at 346. The "aging effect" exists regardless of any other factors. *Id*.

While the sentence must provide deterrence and protect the public, it must also provide Mr. Pathmanathan with educational and vocational training and medical care. In balancing all of the purposes of sentencing, the Court has to strike the appropriate balance between the punitive sanction, protection for the community and the long-term goal of rehabilitation.



Sex offender treatment has demonstrated that cognitive-behavioral therapy is very useful in helping offenders learn to control their propensities. *See e.g.* Ward, Gannon, and Yates, *The Treatment of Offenders: Current Practice and New Development with an Emphasis on Sex Offenders*, 15 Int'l Rev. Victimology 183 (2008); Aos, Miller and Drake, Washington State Institute for Public Policy, *Evidence Based Adult Corrections Programs: What Works and What Does Not* 5-6 (2006) (concluding after review of six rigorous studies that "cognitive behavioral therapy for sex offenders on probation significantly reduces recidivism."). Because sex offender treatment in the BOP typically is not begun until approximately three years before release, a lengthy prison term is not necessary and, in fact, can be counterproductive to obtaining appropriate treatment. In short, a sentence of 15 years is sufficient to ensure that Mr. Pathmanathan does not re-offend.

There is no minimizing Mr. Pathmanathan's criminal conduct. However, a sentence in excess of 15 years would be "greater than necessary." The only measurable goal in a prolonged

period of incarceration would be the satisfaction of a punitive sanction.  But punishment alone does not promote any of the other and equally important statutory goals enumerated in 18 U.S.C. § 3553(a).  The requested sentence is "just punishment" when the Court considers and takes into account 18 U.S.C. § 3582.  In pertinent part, 18 U.S.C. § 3582(a) states:

> The Court, in determining whether to impose a term of imprisonment, and if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that *imprisonment is not an appropriate means of promoting correction and rehabilitation*.  (emphasis added).

The recommended sentence would also not create unwarranted sentencing disparities. The U.S. Sentencing Commission's Quick Facts on Sex Abuse Offenses for 2022 states that 52.2% of sexual abuse offenders were sentenced under the Guidelines Manual range and 4.8% of all sexual abuse offenders received some other downward departure, with an average sentence reduction was 38.3%.[4]  Approximately 44.3% of all sexual abuse offenders received a downward variance, with an average sentence reduction of 30.8%.  Thus a sentence of 15 years will not cause unwarranted sentencing disparities in this case.  Indeed, the most effective deterrent is the certainty of punishment, rather than its length.[5]

### D.  Collateral Consequences to Conviction

Collateral consequences, [including]…family separation, unemployment and loss of income, loss of immigration status and deportation, housing, loss of access to public benefits,

---

[4] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Sexual_Abuse_FY22.pdf.

[5] *See, e.g.*, Nat'l Resource Council, The Growth of Incarceration in the United States, at 131 (2014); *see also* Nat'l Inst. of Justice, U.S. DOJ Office of Justice Programs, *Five Things About Deterrence* (2016) available at https://www.ojp.gov/pdffiles1/nij/247350.pdf. Specifically, research shows that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime."

loss of access to higher education, long-term surveillance, loss of civil rights, etc., compound the damage of an interaction with the legal system.  These life-altering consequences position the legal system as a source of perpetual punishment that denies individuals and communities the stability they need to thrive.  Sam McCann, *How "Collateral Consequences" Keep People Trapped in the Legal System*, Vera Institute (Nov. 29, 2023), https://www.vera.org/news/how-collateral-consequences-keep-people-trapped-in-the-legal-system.

A particular concern in this case is the very significant collateral consequence one is likely to receive when convicted of a sex offense such as this.  Inmates convicted of charges such as his frequently suffer from assault and extortion in the Bureau of Prisons.  *See United States v. Kelly*, 868 F. Supp. 2d 1202, 1204 n.1 (D.N.M. 2012) (noting that defendant sentenced in prior case beaten to death within days of arriving at the federal penitentiary); *see also Inmate Sentenced to 15 Years to Life in Prison for Beating-Murder of Fellow Inmate Believed to be in Custody for Child Molest[ation]*, Orange County, California District Attorney Press Release, Mar. 21, 2012) (inmate convicted of misdemeanor possession of child pornography, a 72-year-old attorney, was beaten to death within days of arriving at federal prison); Kristen Dize, *Harford County Sex Offender Killed in State Prison*, BELAIR PATCH, June 28, 2012; Rina Palta, *For the third time this month, a sex offender is killed in prison*, May 29, 2012.[6]  As the above examples demonstrate, the risk of exposure to violence while at the Bureau of Prisons for someone like Mr. Pathmanathan is very real.

Mr. Pathmanathan also must register as a sex offender upon his release, with the publication of that information to the community and to his friends and neighbors.  Mr. Pathmanathan's sexual offender designation will effectively make him a social outcast for the

---

[6] Available at http://www/scpr.org/blogs/news/2012/05/29/6370/inmate-killed-la-prison/.

rest of his life.  He will be banned from living in many neighborhoods and even entire towns.

*See, e.g.*, *New York Times* Op-ed, "Sex Offender Village" (May 21, 2013); *New York Times*,

"Restricted Group Speaks Up, Saying Sex Crime Measures Go Too Far" (October 1, 2013).  His

name and address will be readily available on the Sex Offender Registry, something anyone with

a computer can view.  Finding employment as a registered sex offender will be extremely

difficult.  As set forth in the *New York Times* piece:

> We live in a society that is terrified of sex offenders, sometimes with good reason. But in some cases the perpetrators, and not just the victims, are denied justice. Every high-profile sex crime spawns a rush to do something about the "predators" among us. Unfortunately, these so-called solutions are doing more harm than good. In the past 25 years, the laws governing sex offenses have gone from punitive to draconian to senseless. The term "sex offender" simply covers too wide a range now, painting the few truly heinous crimes and the many relatively innocuous ones with the same broad brush. This overly broad approach wastes resources that could be better spent, for instance, on clearing the huge and unforgivable backlog of untested rape evidence kits.
>
> We see even deeper problems: the explosion of sex offender registries, stringent yet demonstrably ineffective residency restrictions, and the bizarre world of "civil commitment," where we punish what someone might do rather than what he or she has done. All of this suggests that our entire approach to dealing with sex offenders has gone tragically off the rails.

As several courts have recognized, the collateral consequences of conviction, such as registration

as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment.

*See, e.g., United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on remand from the

Supreme Court for reconsideration in light of *Gall*, overruling its prior holding that it was

inappropriate for the district court to consider the lasting effects of being required to register as a

sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (in a case involving

a conviction for possession of child pornography after *Gall*, affirming the district court's finding

that the defendant "warranted a lower sentence because he lost his teaching certificate and his

state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with

§ 3553(a)'s directive that the sentence reflect the need for just punishment," *id.* § 3553(a)(2)(A), and "adequate deterrence," *id.* § 3553(a)(2)(B)); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution, because the court's findings "were directly relevant to the § 3553(a) analysis, which requires sentences to reflect, among other things, "the history and characteristics of the defendant," the need to "protect the public from further crimes of the defendant," the need to "provide just punishment for the offense," and the need to "afford adequate deterrence").

### III.CONCLUSION

For the foregoing reasons, and such other reasons as may be presented at the sentencing hearing, Mr. Pathmanathan respectfully requests that the Court impose sentence of 15 years.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

 */s/ Diane Shrewsbury*
Diane Shrewsbury
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500

16